## Affidavit of Matthew Murrow, United States Postal Inspector

I, Matthew Murrow, being first duly sworn on oath, state as follows:

1. I am a U.S. Postal Inspector with the U. S. Postal Inspection Service (USPIS), and have been so employed since April 2008. Prior to that, I was a police officer for 13 years and was involved in numerous investigations, including narcotics investigations. I am currently assigned to the Springfield, Missouri, Domicile of the USPIS and have experience enforcing federal mail and drug laws. This affidavit is based on my own personal knowledge and information given to me by other Postal Inspectors and other law enforcement personnel.

2. I received basic training for approximately 12 weeks from the USPIS regarding individuals using the U.S. Mail to transport controlled substances and proceeds from the sale of controlled substances as well as the use of Postal Money Orders to launder the proceeds of controlled substances. I received formal training for one week in September 2011 when I attended the USPIS Narcotics training course in Potomac, Maryland. This training involved narcotic investigation techniques, chemical field testing, and training in the identification and detection of controlled substances and narcotic proceeds being transported in the U.S. Mail and other commercial carriers. As a U.S. Postal Inspector, I have been involved in numerous narcotics investigations involving the U.S. Mail.

3. This affidavit is made in support of an application for a warrant to search a black in color, Apple brand, iPhone 7 cellular telephone, which has been assigned Springfield, Missouri, Police Department (SPD) evidence label P18013015 and is currently in the possession of SPD in Greene County, Missouri, within the Western District of Missouri (hereinafter the Subject Telephone). This affidavit is based upon information that would establish probable cause to believe that evidence of

1

violations of Title 21, United States Code, Sections 846 and 841(a)(1), that is possession with the intent to distribute controlled substances, distribution of controlled substances, and conspiracy to distribute controlled substances, is located on the Subject Telephone. The evidence, in electronic form, may include the information described in Attachment A.

4. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Cellular or wireless telephone: a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.

2

Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

  c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

3

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

5. Based upon my training, experience, and research, I know that the Subject Telephone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

6. Based upon my training and experience, I know that drug couriers and traffickers commonly use multiple methods of communication to arrange transactions and conduct business. Cellular telephones, personal computers, and other devices are frequently used to send and receive coded

4

messages over long distances.

7. Based on my training and experience, I know that a cellular or wireless telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other cellular telephones or traditional "landline" telephones. A cellular telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and telephone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

8. Drug traffickers commonly maintain financial records reflecting accounting of monies collected and disbursed for the purchase and sale of controlled substance. These records have been discovered written on paper and recorded in digital files on computers, telephones, and other similar devices. Records also may include the transfer of monies involved in the sale and procurement of narcotics. Records may reflect the laundering or concealment of the profits from the sale of the narcotics, as proceeds from narcotics trafficking cannot be legally declared. In my experience, it is common for individuals engaged in illegal narcotics activities to utilize a telephone or computer to prepare and store documents relative to, and in connection with, their illegal activities. These records are typically stored on the devices' memory or on external memory devices.

5

9. Based upon my training and experience, I know that cellular or wireless telephones and their compatible hardware, in conjunction with computer software, are often utilized to store records that include, but are not limited to, those relating to business activities, criminal activities, associates names and addresses, and the identity and location of assets illegally gained through these criminal activities. These records are more fully described as information or data stored in the form of electronic or magnetic coding on cellular telephone and computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard drives and removable SIM cards, hard drive cartridges, laser disks, tapes, floppy diskettes, and any other media capable of storing magnetic coding.

10. Based on my training and experience, I know that electronic files can be received, stored, and easily moved from one cellular telephone or electronic storage medium to another. Therefore, electronic files downloaded to or created on one cellular telephone can be copied or transferred to any other cellular telephone, computer, or storage medium at the same location.

11. Based on my training and experience, I know that cellular telephones often contain information that will help identify sources of supply and the intended recipient of the illegal drugs. I know that drug traffickers often refer to other co-conspirators by first name only or by nickname and store such information in the electronic memory of cellular phones. I know that retrieving names, phone numbers, and photographs assists in further identifying sources of supply and co-conspirators who would be difficult or nearly impossible to identify without direct knowledge of these individuals and their drug trafficking organization. I know that traffickers utilize mobile phones and digital cameras to photograph narcotics and proceeds from the sale of drugs. I know that drug traffickers

6

photograph themselves with other co-conspirators and many times photograph themselves, and that these photographs can be transferred to computer memories.

12. Based on my training and experience, I know that once data is electronically encoded on a device, including cellular phones and computers, that the data will remain on the device indefinitely, even after it is deleted using standard methods in most circumstances. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

13. As further described in Attachment A, this application seeks permission to locate not only electronically-stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Telephone because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

7

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

15. In addition, based on my experience, I know that searching digitalized information for evidence of crime often requires the assistance of a qualified cellular phone or computer expert who can accurately retrieve the systems data in a laboratory or other controlled environment. This is true because of the following:

a.  Volume of evidence: Cellular phone storage devices such as SIM cards, hard disks, diskettes, tapes, and laser disks can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive type file names. This may require searching authorities to examine all of the stored data to determine which particular files are evidence or instrumentalities of the crime. This sorting process

8

can take weeks to months, depending on the volume of data stored.

   b. Technical requirements: Searching cellular phone systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from the destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

16. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant

9

at any time in the day or night.

17. This affidavit is based upon my own personal knowledge and information given to me by other Postal Inspectors and other law enforcement personnel. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Subject Telephone, it recites only the relevant facts necessary to establish probable cause to obtain a search warrant for that device. I have not included each and every fact known to me concerning the entities, the individuals, and the events described in this affidavit.

18. On July 17, 2017, I was contacted by the Glenstone Station Post Office in Springfield, Missouri, and advised that Robert ROBINSON had come to the post office and mailed a parcel to Redding, California. I requested and received a search warrant for the parcel on July 19, 2017. When the search warrant was executed, the parcel was found to contain $4,680 in U.S. currency. The return address on the parcel was "Ginger Blue Farms, 889 SW 601, Montrose, MO 64770." It was addressed to "Justus Williams, 2375 Shining Star Way, Redding, CA 96003."

19. Through additional investigation into USPS records, I learned that ROBINSON was also mailing parcels to Redding, California, from the Clinton, Missouri, Post Office. I learned that on July 15, 2017, ROBINSON mailed a parcel from Clinton, Missouri, which also had the return address "Ginger Blue Farms, 889 SW 601, Montrose, MO 64770." It was addressed to "Justus Williams, 2375 Shining Star Way, Redding, CA 96003." I contacted the Redding, California, Post Office and intercepted the parcel before it could be delivered. On August 23, 2017, I requested and received a search warrant for the parcel. When the search warrant was executed, the parcel was found to contain $3,000 in U.S. currency.

20. On April 2, 2018, I learned that a parcel was in route from Oregon to the Montrose, Missouri, address that ROBINSON had used as a return address on several earlier packages. The parcel weighed 13 pounds and was addressed to "Outlaw Equestrian LLC, 889 SW 601, Montrose, MO 64770." Investigators had learned that ROBINSON used the address for several businesses he had registered with the Missouri Secretary of State, including Girl Organics and Ginger Blue Farms. The return address on the parcel was "S. Rodgers, 8195 Colonial Way, Central Point, OR 97502."

21. On April 20, 2018, I learned another parcel was in route for delivery to the Montrose, Missouri, address. On April 23, 2018, Springfield Police Department (SPD) Detective Brandon Bowling met with the mail carrier prior to setting up surveillance on the address. He observed the parcel had a return address of "Rocky Lewis, 4855 Boulder Hwy, Las Vegas, NV 89121" and was addressed to "Ginger Blue Farms, 889 SW 601, Montrose, MO 64770." After meeting with the mail carrier, investigators set up surveillance and observed that ROBINSON was already at the address.

22. Bowling observed the mail carrier drop the parcel at the end of the driveway, next to the mailbox. Several hours later, ROBINSON left the address and picked up the parcel when he got near the mailbox. He placed the parcel into his truck and drove away.

23. Investigators followed ROBINSON south on Missouri Highway 13 until he entered Greene County, Missouri, where Missouri State Highway Patrol (MSHP) Trooper Mike Adams made a traffic stop of ROBINSON for speeding. During the stop, Trooper Adams requested a canine respond to his location. SPD Detective Jason Copley responded to the location with his police service dog, Rocky. Rocky indicated on the exterior of ROBINSON's truck and the package in the back of the truck. During the stop, a 9mm Smith and Wesson firearm was seized along with 1,085 grams of marijuana from the parcel that had been delivered earlier. ROBINSON was booked into the

11

Greene County, Missouri, Jail for possession of a controlled substance. His vehicle was seized. During the traffic stop, Copley seized ROBINSON's black, Apple, iPhone 7 that was in a blue and gray case (Subject Telephone).

24. Bowling then applied for and received a search warrant for the residence at 889 SW 601, Montrose, Missouri. The search warrant was issued through the Henry County, Missouri, Circuit Court on April 23, 2018.

25. Later that night, members of NET and the Internal Revenue Service (IRS) executed the warrant with the assistance of the Henry County Sherriff's Office. They seized approximately one-half pound of marijuana, three rifles, ammunition, paperwork, and drug packaging from the residence. The packaging was very similar to the other parcels suspected of containing controlled substances which had been sent to the address, but these were addressed to "Girl Organics, c/o Joanna Lance, 17513 W 111th place, Olathe, KS 66061."

26. On April 26, 2018, Bowling received recordings of the phone calls that ROBINSON made from the Greene County, Missouri, Jail on April 23, and 24, 2018. During one of the phone calls, ROBINSON stated he would need to get a different cellular telephone because investigators had taken his, and it contained all of his contact phone numbers.

27. On April 23, 2018, ROBINSON spoke to his two daughters and then asked them to hand the telephone to "Kelly." During the investigation of ROBINSON, the only Kelly that had been identified as an associate of ROBINSON was Kelly SICARD. During multiple calls between ROBINSON and SICARD, they spoke about "moving everything to her apartment." SICARD stated she had moved "all of it for the most part."

28. Previously, on February 27, 2018, Bowling had learned that SICARD was paying for utilities

12

at 2150 South Ingram Mill #717. However, Bowling had conducted weekly surveillance on that location since 2016 and had never observed ROBINSON or SICARD's vehicles there. Investigators suspected ROBINSON was using the apartment as a "stash house." Based on my training and experience, I know that it is common for those who distribute controlled substances to have a location separate from their primary residence to store controlled substances and conduct other drug related activity. Investigators believed this was consistent with the short visits ROBINSON was observed making to the apartment while it was under surveillance early on in this investigation.

29. Based on the above described conversations, investigators believed ROBINSON was referring to 2150 South Ingram Mill, Apartment #717, Springfield, Missouri, when he was speaking about SICARD's apartment. On April 26, 2018, Bowling obtained a search warrant for 2150 South Ingram Mill, Apartment #717. Later that day, Bowling executed the search warrant with the assistance of SPD and the Internal Revenue Service. The apartment was not occupied during the execution of the search warrant. The following items were recovered from the apartment, a black and silver box containing marijuana, a large box containing marijuana and cocaine, drug packaging supplies, a large digital scale, and a black safe containing cocaine.

30. Based on my training and experience, my knowledge of how drug dealers utilize cellular telephones, the fact that the Subject Telephone was the only cellular telephone in ROBINSON's possession, and his statement that the telephone had all his contact information, there is probable cause to believe that the Subject Telephone contains evidence of violations of Title 21, United States Code, Sections 846 (conspiracy to distribute controlled substances) and 841(a)(1), (possession with the intent to distribute a controlled substance and distribution of controlled substances), and request a search warrant be issued to search the Subject Telephone and seize the information listed in

13

ATTACHMENT A.

31.     In light of the nature of this affidavit and in order to keep from compromising the on-going nature of this investigation, I request that it be sealed and that service of the order granting authorization for searching the Subject Telephone be delayed for 30 days following execution of the order.

Further your Affiant sayeth not.

_____
Matthew Murrow
United States Postal Inspector

Subscribed and sworn before me this  25th  day of  June , 2018

_____
David P. Rush
United States Magistrate Judge

14